KINGSTON HOUSING AUTHORITY *vs.* SANDONATO &
BOGUE, INC., & another.[1]

No. 89-P-604.

Plymouth. March 15, 1991. - August 23, 1991.

Present: KASS, GILLERMAN, & GREENBERG, JJ.

*Limitations, Statute of. Repose, Statute of. Contract,* Construction con-
tract, Performance and breach, Under seal.

The claims of a housing authority that certain defects in a construction
project were latent and undiscoverable so as to toll the statute of limita-
tions were barred under the authority of *Melrose Hous. Authority* v.
*New Hampshire Ins. Co.,* 402 Mass. 27 (1988), where the housing au-
thority had had a representative inspecting construction as it proceeded.
[272-273]
There was no merit to a housing authority's assertion that its negligence
claims against a construction contractor sounded in contract, thus
avoiding the statute of limitations applicable to such claims set forth in
G. L. c. 260, § 2B. [273-274]
The twenty-year limitation period set forth in G. L. c. 260, § 1, First, did
not apply to a construction contract that did not manifest the intent of
the parties that the contract be treated as made under seal. [274-276]

CIVIL ACTION commenced in the Superior Court Depart-
ment on November 18, 1985.

Motions for summary judgment were heard by *George Ja-
cobs,* J., and the matter was reported by him to the Appeals
Court.

*Robert J. Steeves, Jr.,* for the plaintiff.

---

[1]Aetna Casualty and Surety Company, the surety for Sandonato &
Bogue, Inc. A brief was filed on behalf of Carleton R. Richmond, Jr., the
architect for the housing project with which the controversy is concerned.
Thereafter, Richmond settled with the Kingston Housing Authority and
with Sandonato & Bogue, Inc., and Aetna, who had brought cross-claims.
The parties notified us of those settlements and of their intention to file a
stipulation of dismissal, with prejudice, under Mass.R.Civ.P. 41(a)(1)(ii),
365 Mass. 803 (1974).

*John D. Dwyer* for Sandonato & Bogue, Inc., & another.

*George C. Deptula* for Carleton R. Richmond, Jr., was present but did not argue.

KASS, J. Much of what the Kingston Housing Authority (the KHA) has strenuously argued on its appeal is governed by *Melrose Hous. Authy.* v. *New Hampshire Ins. Co.,* 402 Mass. 27 (1988). As in *Melrose,* the KHA had a clerk of the works inspecting construction as it went up and may not claim that the defects which plague the project concerned were inherently unknowable. What remains in the case is KHA's contention that the obligations of Sandonato & Bogue, Inc. (Sandonato), the general contractor on the project, extend beyond the limitation — six years — established by G. L. c. 260, § 2B. The applicable limitations period, KHA urges, is twenty years after its cause accrued because its contract with Sandonato is under seal. See G. L. c. 260, § 1, First.

After hearing the case on defense motions for summary judgment, supported by affidavits, interrogatories, depositions, and documents, a judge of the Superior Court decided KHA's claims were time barred under G. L. c. 260, § 2B, except for a count which alleged an intentional breach of the general contract by Sandonato, as to which the judge thought the longer period applied. As to all other counts in the complaint, the motions for summary judgment were allowed. The judge reported the case to us under G. L. c. 213, § 1B, G. L. c. 231, § 111, and Mass.R.Civ.P. 64, 365 Mass. 831 (1974). We conclude that all counts in the complaint are time barred.

In outline, these are the facts. KHA entered into a contract with Sandonato on March 21, 1975, to have the latter construct forty-eight units of housing, distributed among six separate buildings. Also included in the contract was a community building. Sandonato substantially completed the job in 1976, and KHA at that time accepted the project, except for punch list items. At once, however, ominous difficulties surfaced. Keeping out rain and cold is the most fundamental function of housing and these buildings did neither. As one

witness described them, "They leaked like an eel basket." The KHA held money back from the contractor until things should be put right. Through 1976 and 1977, the architect and Sandonato made a variety of efforts to remedy the leakage but enjoyed little success. The KHA thought in 1979 that an attempt at waterproofing was working and voted to "close out" the contract with Sandonato. Leakage difficulties persisted, however, and in 1984, the KHA hired independent engineers to diagnose the problem and prescribe a cure.

As part of their study, the engineers opened up several walls and discovered significant deviations from contract specifications. The construction drawings had called for a load bearing composite wall consisting of a brick exterior and a block interior with high strength mortar binding the two. A system of horizontal steel rods was further to tie the exterior bricks and interior blocks together. The corners of each wall were to be reinforced and the roof trusses were to rest on plate bearings which were, in turn, to be bolted to the composite mortar between the interior blocks and exterior bricks. Many of these specifications had been violated. The engineers found a one-half inch air space between the exterior brick and block walls; the reinforcing rods were not spaced as called for; the corners were not reinforced; the blocks in the interior wall were not solidly grouted, and the bolts for the plate bearings were not in place.

How these deviations contributed to the leaky walls, if they did, is of no consequence in the litigation if the statute of repose (G. L. c. 260, § 2B) and all other applicable limitations periods have run, and this is so whether the claim is cast in the form of tort or implied warranty, as we shall later explicate. *Klein* v. *Catalano*, 386 Mass. 701, 718-720 (1982). In *Melrose Hous. Authy.* v. *New Hampshire Ins. Co.*, 402 Mass. at 32-35, it was decided that if an owner retained for itself or its representative the right to inspect the work and to order uncovered any work which had not been inspected, the owner could not later take the position that a defect was inherently undiscoverable until ultimately uncovered and diagnosed. It is not disputed that the KHA, as owner, had the

right, under the general conditions of its construction contract, to inspect and to order work uncovered. Full-time inspection was the duty of a clerk of the works and periodic inspection was the duty of the architect. See also *Hanson Hous. Authy.* v. *Dryvit Sys., Inc.,* 29 Mass. App. Ct. 440, 443-444 (1990). Able to keep an eye on construction as it proceeded, the KHA may not later attempt to show that the defects were latent and undiscoverable.[2]

Owners hoping to jump over the bar of G. L. c. 260, § 2B, observed that the statute was directed to actions of tort. They, therefore, attempted casting their claims in contract terms, i.e., breach of warranty, see, e.g., *Klein* v. *Catalano,* 386 Mass. at 718, in hope of applying a longer statute of limitations. That effort, as already noted, met with no success because the act of unintentionally failing to conform with contract specifications is not different from negligent workmanship. Unless breach of warranty in this context were read as just another label for negligent workmanship, the statute, which was curative in the sense that it sought to establish a special limitation for the litigation of construction disputes, would be nullified by the simple expedient of giving the action a different label. *Klein* v. *Catalano,* 386 Mass. at 718-720.

Perhaps mindful of that difficulty, the KHA included in its complaint the allegation that the contractor intentionally deviated from the contract specifications and concealed the deviation. The construction contract, the KHA contends, was under seal, and, therefore, the applicable statute of limitations is twenty years. G. L. c. 260, § 1, First. That artifice is also too facile a circumvention of G. L. c. 260, § 2B. An action for damages based on a covert and intentional switch of the contract specifications has the ingredients of a familiar

---

[2]Parenthetically, the KHA's position would not be improved by application of the "discovery rule." Leakage difficulty was dramatically apparent from "day one," and through the application of diligence, the KHA was in a position to discover what was wrong. See *White* v. *Peabody Constr. Co.,* 386 Mass. 121, 129-130 (1982); *Melrose Hous. Authy.* v. *New Hampshire Ins. Co.,* 402 Mass. at 32-34, and cases cited. Compare *Anthony's Pier Four, Inc.* v. *Crandall Dry Dock Engrs., Inc.,* 396 Mass. 818 (1986).

tort, misrepresentation with intent to deceive.[3] See, e.g., *Yorke* v. *Taylor*, 332 Mass. 368, 373-374 (1955). The misrepresentation may be effected by a construction contractor through its conduct. *Henderson* v. *D'Annolfo*, 15 Mass. App. Ct. 413, 422-423 (1983). Once again it seems implausible that the legislative policy underlying § 2B, to establish a special deadline for filing a complaint alleging defective design or construction of a building project, should be so easily eluded. Cf. *Klein* v. *Catalano*, 386 Mass. at 718-720. We read the complaint by its gist, rather than its label.

As the *Klein* v. *Catalano* opinion remarks, one may not pretend that the language of § 2B confining its application to an action of tort does not exist. *Id.* at 720. See *Devaney* v. *Watertown*, 13 Mass. App. Ct. 927, 928 (1982) (court ought not to regard statutory language as superfluous). One may imagine, for example, an express warranty in a contract (see *Klein* v. *Catalano, supra* at 720) or a good faith deviation from specifications in the belief that such was in the interest of the owner. That is not, however, what has been alleged in this case.

Ordinarily nothing will turn on whether the general contract statute of limitations, G. L. c. 260, § 2, or the special statute of repose we have been discussing, § 2B, applies. Each specifies a period of six years.[4] While § 2 runs from

---

[3]As to the similarity of a contract theory claim for damages based on misrepresentation to the same claim made on a tort theory, see Restatement (Second) of Contracts, c. 7, Topic 1, Introductory Note (1981).

[4]The primary limitations period for an action under § 2B is actually three years after the cause of action accrues. The statute further provides "that in no event shall such actions be commenced more than six years after the earlier of the dates of: (1) the opening of the improvement to use; or (2) substantial completion of the improvement and the taking of possession for occupancy by the owner." G. L. c. 260, § 2B, as appearing in St. 1984, c. 484, § 53. In cases involving a dispute between an owner and a contractor, the time the cause of action accrues will most often fall during the construction period, i.e., before or just about at the time of opening to use or substantial completion. On the other hand, a person could sustain a personal injury because of a construction defect. The action would have to be brought within three years of the injury, even though there were five years still to go before expiration of the six-year period triggered by opening to use or substantial completion.

the time the cause of action accrues, and § 2B runs from the opening of the improvement for use or substantial completion of the improvement, for the reasons set out in note 4, *supra*, the contract limitation period in the generality of cases will have run out slightly before the statute of repose period. That is so in this case. The apparently faulty construction of the building walls occurred before the project was open to use or substantially complete. It is for that reason that KHA looks to G. L. c. 260, § 1, First, and a twenty-year statute of limitations.

Under G. L. c. 4, § 9A, "a recital that [an] instrument is sealed . . . or is given under the hand and seal of the person signing . . . or that such instrument is intended to take effect as a sealed instrument, shall be sufficient to give such instrument the legal effect of a sealed instrument. . . ."[5]

Words such as "signed as a sealed instrument" or "witness our hands and seals hereto" do not appear in the contract between the KHA and Sandonato. Compare *Marine Contractors Co. v. Hurley*, 365 Mass. 280, 285 n.2 (1974); *Nalbandian v. Hanson Restaurant & Lounge, Inc.*, 369 Mass. 150, 154-156 (1975); *Johnson v. Norton Hous. Authy.*, 375 Mass. 192, 195 (1978). What does appear is the typewritten word "seal," in parentheses, to the right of the blanks for the name of the owner (in this case the KHA) and the line for the signature of the officer of the owner. The word "seal" does not appear anywhere in the signature block for the contractor. That alone is insufficient to convert the contract into one made under seal. *Capitol Amusement Co. v. Gallagher*, 268 Mass. 321, 323 (1929) (the symbol L.S.[6] does not convert the document to a sealed instrument). 2 Williston, Contracts § 271A (3d ed. 1959).

Barely discernible in the record appendix is a faint outline of what may be a seal stamp on each signature block. As-

---

[5]As a further concession to the incompatibility of the ceremony of sealing instruments with the high volume of documents in contemporary commerce, G. L. c. 4, § 9B, accepts the impression or stamping of a seal in lieu of a wax or wafer seal attached to the paper.

[6]L.S. stands for locus sigilli, place of the seal. Restatement (Second) of Contracts § 96 comment a (1981).

suming those marks are corporate seals, they do not convert the contract as one to be specially regarded as under seal. In similar circumstances authorities have construed a corporate seal stamp as authentication of the authority of the signing officers and not as a manifestation of intent that the instrument is under seal. *Simonson* v. *International Bank of Washington*, 312 F.2d 887 (D.C. Cir. 1963). *President & Directors of Georgetown College* v. *Madden*, 660 F.2d 91, 96 (4th Cir. 1981). *Blue Cross & Blue Shield* v. *Odell Assocs., Inc.*, 61 N.C. App. 350, 361-362 (1983). 2 Williston on Contracts § 271A at 168-169. 1A Corbin on Contracts § 242 (1963). Compare *Gildenhorn* v. *Columbia Real Estate Title Ins. Co.*, 271 Md. 387, 390, 398-406 (1974), in which a corporation's facsimile seal was printed together with a recitation that its corporate name and seal had been affixed. If impressed in this case, we think the corporate seals had a similarly limited significance and did not express an intent by the parties to have the contract treated as made under seal. Such an interpretation is appropriate in light of the diminished significance of the seal in contemporary law and practice, see *Nalbandian* v. *Hanson Restaurant & Lounge, Inc.*, 369 Mass. at 154-156 (see also Restatement [Second] of Contracts, c. 4, Topic 3, Introductory Note [1981]) and, in this particular case, harmonizes with the legislative design which underlies G. L. c. 260, § 2B.

We respond to the report with the answer that summary judgment is to be allowed as to all counts of the complaint and that judgment is to be entered for the defendants remaining in the case, Sandonato and Aetna Casualty and Surety Company.

*So ordered.*